**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10827

_____

TALLAHASSEE BAIL FUND,

*Plaintiff-Appellee,*

*versus*

CLERK OF THE CIRCUIT COURT AND COMPTROLLER
FOR LEON COUNTY,

*Defendant-Appellant,*

ATTORNEY GENERAL OF FLORIDA,

*Intervenor-Appellant.*

_____

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00297-MW-MAF

_____

2              Opinion of the Court   24-10827 & 24-10992

_____

No. 24-10992

_____

TALLAHASSEE BAIL FUND,

*Plaintiff-Appellant,*

*versus*

CLERK OF THE CIRCUIT COURT AND COMPTROLLER
FOR LEON COUNTY,

*Defendant-Appellee,*

ATTORNEY GENERAL OF FLORIDA,

*Intervenor-Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00297-MW-MAF

_____

Before JORDAN, NEWSOM, Circuit Judges, and CORRIGAN,* District Judge.

PER CURIAM:

On a case-by-case basis, the nonprofit Tallahassee Bail Fund ("Bail Fund") voluntarily posts bond for criminal pretrial detainees in Leon County, Florida, who, though deemed eligible for bond, simply cannot afford it.   If a criminal defendant is on bond, appears as ordered, is acquitted, or is convicted and does not owe any fines, the Clerk of Court returns the bond money in full to the Bail Fund, which then uses that money to post bond for the next indigent pretrial detainee it determines to help.   However, by Florida statute, if a defendant is on bond, appears as ordered, is subsequently convicted and owes any fines to the county, the Clerk must use the bond money to pay those fines before releasing the balance (if any) to the party who posted the bond.   This statutory scheme significantly reduces the amount of money the Bail Fund has available to bond out future defendants.   The Bail Fund filed suit against the Leon County Clerk of Court claiming the statute requiring fines to be paid with bond money is unconstitutional under the Eighth Amendment as excessive bail for the criminal pretrial detainees and as an excessive fine on the Bail Fund.   The district court agreed with the former but not the latter.   Both parties appealed.

---

* The Honorable Timothy J. Corrigan, Senior United States District Judge for the Middle District of Florida, sitting by designation.

After carefully considering the issues, and with the benefit of oral argument, we think the district court correctly held that the statute does not result in an excessive fine on the Bail Fund. But while we acknowledge the potency of the excessive bail challenge, the Bail Fund does not have third-party standing to bring it. Thus, we must reverse on that ground.

## I

### A

Under the Florida Constitution, every person charged with a crime is "entitled to pretrial release on reasonable conditions," with exceptions not applicable here. Fla. Const. art. I, § 14. In fashioning the terms of pretrial release, the court's intent is to "ensure the appearance of the criminal defendant at subsequent proceedings and to protect the community against unreasonable danger from the criminal defendant." Fla. Stat. § 903.046(1). While there is a general presumption favoring release on non-monetary conditions, the court may impose a monetary bond as a condition of release, which can be satisfied by executing a surety bond, an appearance bond, or a cash bond. Fla. R. Crim. P. 3.131(c)(1).

In relevant part, Florida Statute section 903.286(1) states that "the clerk of the court shall withhold from the return of a cash bond posted on behalf of a criminal defendant by a person other than a bail bond agent . . . sufficient funds to pay any unpaid costs of prosecution, costs of representation . . .    , court fees, court costs, and criminal penalties." Fla. Stat. § 903.286(1). Section 903.286(2) further provides that "[a]ll cash bond forms . . . must

prominently display a notice explaining [this requirement]."[1]    Fla. Stat. § 903.286(2).

Thus, when a depositor posts a cash bond for a pretrial detainee, the Leon County Sheriff requires the defendant and the depositor to sign bond paperwork which states that if the defendant appears in court as ordered, the bond amount will be returned to the depositor "**less any unpaid court fees, court costs and criminal penalties owed by the defendant to the Leon County Clerk of Court on this or any other criminal or civil case in Leon County per section 903.286, Florida Statutes** . . . ."[2]  Dkt. No. 108 at 4 (quoting from bail form) (emphasis in original).    The Sheriff will not accept the bond money if the depositor does not sign this bond form.

**B**

The Bail Fund is a small volunteer-run nonprofit entity started in 2020 and incorporated in 2022, supported through individual donations and grants.    Its mission is to provide cash bail

---

[1]  In the district court opinions and parties' briefs, they often refer to the withheld funds as "LFOs"—legal financial obligations.    This opinion uses the term "fines."

[2]  The parties did not raise and the Court takes no position as to whether the Sheriff's notice regarding payment of funds owed by the defendant on a "civil" case may reach beyond that permitted by § 903.286.    The parties likewise did not raise and the Court takes no position as to whether § 903.286 is limited to fines due in a defendant's current case only (and not past fines).    *Cf. Ellis v. Hunter*, 3 So. 3d 373, 383-85 (Fla. 5th Dist. Ct. App. 2009) (holding § 903.286 applies to current and past due fines), *rev. denied*, 10 So. 3d 632 (Fla).

assistance to indigent pretrial detainees.    The Bail Fund operates on a "revolving fund" model whereby the bond money returned after one defendant's case is adjudicated is then used to bond out the next pretrial detainee.    Unlike a bail bond agent, the Bail Fund does not charge a fee for its services, thereby "mak[ing] pretrial release a possibility for those who can afford neither a cash bond nor a professional bond service."    Dkt. No. 108 at 3.    The Bail Fund receives about ten referrals per month, mainly from the public defender, and it chooses whom to assist based on its available cash, the type of offense charged, the defendant's criminal history[3] and demographics, the bond amount, and the amount of any outstanding fines the defendant may owe.    The bond amount the Bail Fund typically posts ranges from $100 to $2,500, with the average being $1,000.    In addition to posting cash bonds, on occasion (such as when the bond is very high), the Bail Fund pays for a surety bond through bail bond companies, but doing so generally costs 10% of the bond, which is not recoverable.    When a surety bond is posted by a bail bond company, no funds are later withheld for the payment of fines.    *See* Fla. Stat. § 903.286(1).

Between 2021 and 2024, the Bail Fund posted cash bonds for approximately 37 pretrial detainees.    Although the Clerk is authorized to forfeit bond money if a defendant fails to appear, only a couple of the Bail Fund's clients have ever failed to appear and none of the Bail Fund bond money has been withheld on that basis.

---

[3] As a general policy, the Bail Fund will not bond out someone whose current or past charges involve violent crimes or crimes against children.

However, as time went on, the Bail Fund realized that substantial funds were being withheld from the bonds for the payment of fines.   Indeed, since 2021, the Clerk of Court has withheld nearly two-thirds of the Bail Fund's bond money to pay current or past due fines.   The Bail Fund felt aggrieved that so much of its money was being used to pay fines, jeopardizing its ability to post bonds for future detainees.

## C

After discussions with the Clerk of Court failed to yield any change to the Clerk's procedures, the Bail Fund filed suit against the enforcement of § 903.286, raising Eighth and Fourteenth Amendment claims of excessive bail, excessive fines, and lack of due process.   The Bail Fund moved for a preliminary injunction and the Clerk moved to dismiss; the district court denied both motions following a hearing.   Meanwhile, Florida's Attorney General intervened to defend the constitutionality of the statute and moved to dismiss the Bail Fund's complaint on a number of grounds.   All parties then moved for summary judgment.   The district court held the Bail Fund lacked third-party standing to bring an excessive bail claim on behalf of its current clients,[4] and the Bail Fund's

---

[4] The district court determined the Bail Fund could not bring a claim as to any of its current clients because their interests were adverse—while the Bail Fund would benefit if its bond money was returned, the defendants already out on bond would benefit by having their outstanding fines paid.   Not only would the Bail Fund's payment of fines eliminate (or reduce) the defendants' debts, it also helped the defendants in other ways because, in Florida, having unpaid court fines or fees carries significant consequences, including driver's

excessive fines and due process claims were due to be dismissed based on the Clerk's qualified immunity in her individual capacity, and for failure to state a claim against the Clerk in her official capacity. The case proceeded to a bench trial on the Bail Fund's excessive bail claim as to future pretrial detainees.

At trial, the Bail Fund's co-founder testified and produced documentary evidence showing the bond money withheld for the payment of past due fines. She estimated the amount to be around $14,000 for the preceding 3-year period, funds which would have been used to bond out other defendants. She testified that the Bail Fund now takes into account the amount of outstanding fines a pretrial detainee owes before deciding whether the Bail Fund can assist that person, knowing that money likely will not be recovered. She further identified two people who, but for the high amount of their past-due fines, the Bail Fund was prepared to bond out.

Thereafter, the district court entered its Final Order, finding that the Bail Fund had Article III standing and third-party standing to raise an excessive bail claim on behalf of its future clients, and that the Clerk's enforcement of § 903.286 violated the Bail Fund's future clients' rights under the Eighth Amendment to be free from excessive bail. The district court therefore entered a permanent

---

license suspension and inability to restore voting rights. *See* Fla. Stat. §§ 322.245(5)(a), 98.0751(2)(a)5.b.

injunction against the Clerk's enforcement of § 903.286(1) as to the Tallahassee Bail Fund.[5]

The Clerk and Attorney General appeal the district court's Final Order arguing the Bail Fund lacks both Article III standing and third-party standing, and that the district court erred in holding § 903.286(1) violates the Eighth Amendment. The Bail Fund cross-appeals the dismissal of its excessive fines claim.[6]

## II

"We review standing determinations *de novo*." *Tanner Advert. Grp., L.L.C. v. Fayette Cnty.*, 451 F.3d 777, 784 (11th Cir. 2006) (*en banc*) (citation omitted). Review of the constitutionality of a state statute is likewise determined *de novo*. *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1277 (11th Cir. 2001). The factual findings informing those issues are not challenged but, in any event, would be reviewed only for clear error. *Spears v. Bay Inn & Suites Foley, LLC*, 105 F.4th 1315, 1318 (11th Cir. 2024). In reviewing the order dismissing the excessive fines claim, we, like the district court, take the allegations of the complaint as true and construe them in the light most favorable to the Bail Fund. *Leib v.*

---

[5] The district court made clear that its injunction was limited to the Leon County Clerk of Court's enforcement of § 903.286(1) against the Tallahassee Bail Fund.

[6] The Bail Fund did not appeal the dismissal of its due process claim, its excessive fine claim against the Clerk in her individual capacity, or its excessive bail claim on behalf of its current clients.

*Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305 (11th Cir. 2009).

### III

### A

We first address whether the Bail Fund has Article III standing to raise its excessive bail challenge as to potential future clients. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim [it] seeks to press.") (citations omitted).

Under *Lujan v. Defenders of Wildlife*, a plaintiff demonstrates Article III standing by showing (1) that it has suffered an injury-in-fact that is (2) traceable to the defendant and that (3) will likely be redressed by a favorable ruling. 504 U.S. 555, 560-61 (1992). If controverted, the facts informing this showing must be adequately supported by evidence at trial. *Id.* at 561.

### 1

To demonstrate injury-in-fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations and internal quotations omitted). "Because injunctions regulate future conduct," the Bail Fund must demonstrate an actual or imminent "threat of *future* injury." *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (emphasis in original) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). There is no dispute that the Bail Fund suffers a "concrete

and particularized" injury when the Clerk uses the Bail Fund's bond money to pay fines.    *See, e.g.*, *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) (explaining that an economic injury "is the epitome of concrete") (citing *Craig v. Boren*, 429 U.S. 190, 194-95 (1976)).

To show that an injury is "actual or imminent," the alleged injury cannot be "too speculative," rather, it must be "*certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (citation modified).    "Allegations of possible future injury do not satisfy" Article III standing requirements. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).   The Clerk argues the Bail Fund fails this part of the test because a lengthy and unpredictable chain of events must first occur:   the Bail Fund must choose to post bond for a defendant, the defendant must appear as required, the defendant must be convicted, fines must be owing and/or imposed, the defendant must not pay the fines or secure the substitution of payment by performing community service, the Clerk must then withhold payment for the fines from the bond money, and the Bail Fund must then fail to recover the funds from the defendant.    The Clerk argues that any number of events could break this chain, making the Bail Fund's alleged injury merely conjectural and speculative.

But this scenario is hardly conjectural or speculative.   Indeed, as the evidence at the non-jury trial demonstrated, this same sequence of events happens over and over again, resulting in significant diminution of the Bail Fund's coffers.   It is no "mere

12                    Opinion of the Court                    24-10827

speculation" that this cycle will continue—bond money deposited by the Bail Fund will repeatedly be taken by the Clerk for the payment of fines.[7]    *See Clapper*, 568 U.S. at 410; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211-12 (1995) (holding plaintiff's injury was certainly impending when it was likely to occur at least once per year when government controlled construction contracts were awarded); *Lujan*, 504 U.S. at 564, n.2 (explaining that while "imminence" is a "somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending") (emphasis in original) (quotations omitted) (citing *Whitmore*, 495 U.S. at 158).    *Cf. Clapper*, 568 U.S. at 410 (holding plaintiffs could not show injury-in-fact where their fear of being subject to allegedly unlawful government surveillance in the future was based on a "highly attenuated chain of possibilities"); *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1238 (11th Cir. 2019) (holding a frequent flier did not demonstrate imminence of an injury where

---

[7] The option to perform community service in lieu of paying fines is permitted only by successful petition to the court.    *See* Fla. Stat. § 938.30(2).    The Clerk offered no evidence to the district court regarding the frequency with which such petitions are filed or granted.    Moreover, community service is not an option in all circumstances.    *See, e.g.*, *Brown v. Florida*, 348 So. 3d 31, 34 (Fla. 1st Dist. Ct. App. 2022) (holding trial court erred by permitting defendant to perform community service in lieu of paying fine where statute did not authorize an alternative to payment) (disapproved on other grounds by *Parks v. Florida*, 411 So. 3d 414 (Fla. 2025)); *Burgess v. Florida*, 683 So. 2d 1099, 1100 (Fla. 2d Dist. Ct. App. 1996) (reversing trial court order converting mandatory costs to community service).

24-10827 & 24-10992   Opinion of the Court                    13

he could only speculate that he would be subjected to the randomized airport screening protocols he challenged).

Moreover, "when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again." *31 Foster Children v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003) (citing *Lyons*, 461 U.S. at 106). Here, the Bail Fund does not control the Clerk's timing for using bond money to pay fines, which she is mandated to do by the challenged statute; but that she will do so in the imminent future is "certain." *See, e.g.*, *id.* (finding foster children in custody of state showed imminent threat of future injury, even though they could not predict when any of them would next be subjected to the state's challenged practices).

We likewise reject the Clerk's argument that the Bail Fund cannot show imminence because it exercises a degree of control over its own injury by choosing whom to bail out and when. But the Bail Fund would not be able to achieve its mission if it limited its client base to defendants who did not have criminal records (and thereby likely owe no fines) or stopped its operations. This is therefore unlike the situation in *Lujan* where plaintiffs could not show an immediate injury because it was their choice as to when, or even if, to travel to Egypt and Sri Lanka where they hoped to observe endangered species allegedly being harmed from scaled back oversight by the U.S. government. 504 U.S. at 563-64. *See also Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1340 (11th Cir. 2013) ("Given that ADA testing appears to be Houston's

avocation or at least what he does on a daily basis, the likelihood of his return for another test of the Presidente Supermarket, which is located on his routine travel route, is considerably greater than the *Lujan* plaintiffs' return to far away countries with unstable political situations.")

The Bail Fund has sufficiently demonstrated its threatened losses are "actual or imminent, [and] not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified).

**2**

As for traceability, the Bail Fund must show a "causal connection between [its] injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (citation modified); *see also Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2025) ("The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs.") (citation omitted).   The injury likewise cannot be "self-inflicted" in the sense that a party cannot cause its own harm by taking steps in response to a challenged act that is not directed at it.   *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (holding Pennsylvania's decision to extend a tax credit to its residents working in New Jersey to alleviate additional tax New Jersey imposed on those residents was not an injury to Pennsylvania traceable to New Jersey); *cf. Fed. Elec. Comm. v. Cruz*, 596 U.S. 289, 297-98 (2022) (holding

Senator demonstrated traceability where he was directly subject to challenged loan-repayment provision, even though he had option to avoid liability by repaying loans instead).    Nor is an injury traceable to the defendant's actions if the plaintiff has a legal mechanism to avoid the injury.    *All. for Hippocratic Med.*, 602 U.S. at 389-90 (doctors' injury not traceable to new FDA regulation when law already protected them against repercussions for following their consciences).

The Clerk contends that intervening independent actions of the Bail Fund and the defendants it assists combined with the legal alternatives available to the Bail Fund break any causal connection between the Clerk's conduct and the Bail Fund's injury.    According to the Clerk, the Bail Fund could require the defendants to pay the Bail Fund back or attempt to substitute their fines with community service, make them surrender before trial (which results in cancellation of the bond and a full refund), or use a bail bond service (which is exempted from § 903.286), or simply choose not to bond out those with past fines.    But if indigent defendants could afford to pay the Bail Fund, they would just pay their own bail and their own past fees.    As for community service, it is not up to the Bail Fund to decide whether to permit that alternative, nor is it even an option in all cases.    *See supra*, note 7.    And as for having the defendants surrender before trial, the district court found this option is no option at all—not only is there no evidence that the Bail Fund has the means to seize its clients to return them to the state's custody but doing so would be entirely contrary to the Bail Fund's

mission.    Nor is it a solution for the Bail Fund to use a bail bond service, because that too causes a repeated loss of funds, eroding the Bail Fund's ability to use its revolving fund model.    Finally, as a Bail Fund founder testified, so many indigent defendants in the criminal justice system have been there before that assisting only those who are first time offenders would leave the Bail Fund with very few people to help.

Relying on the credible evidence from the non-jury trial, the district court found that but for the Clerk's withholding funds pursuant to § 903.286, the Bail Fund would have more funds returned and would bond out more defendants.    In other words, "the record is clear that [the Bail Fund] loses its funds because [the Clerk] withholds them."    Dkt. No. 108 at 11.    We agree.    The Bail Fund's injury is "traceable" to the actions of the Clerk.[8]    *Lujan*, 504 U.S. at 560 (citation omitted).

### 3

The Bail Fund must further show that if it secures the relief it seeks—a declaration that the statute is unconstitutional—its injury will be redressed.    *Id.* at 561.    If the statute is declared unconstitutional, the Clerk will no longer withhold the Bail Fund's money, making those funds available to bond out future

---

[8] If our analysis of injury-in-fact and traceability seem repetitive, that's because it is.    "In cases of alleged future injuries to unregulated parties from government regulation, the causation [or traceability] requirement and the imminence element of the injury in fact requirement can overlap."    *All. for Hippocratic Med.*, 602 U.S. at 385, n.2.

defendants, as is the Bail Fund's mission.    *All. for Hippocratic Med*, 602 U.S. at 381 ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury.") (citation omitted). The Bail Fund demonstrates its injury will be redressed by a favorable ruling.

★ ★ ★

We therefore find the Bail Fund has Article III standing to raise its excessive bail claim.

**B**

While the Bail Fund has Article III standing, its contention is that § 903.286 violates *its clients'* Eighth Amendment rights to be free from excessive bail.    Generally, a party "must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties."    *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citations omitted).    Because it seeks to do just that, the Bail Fund must additionally meet a prudential requirement—it must show it has third-party standing to assert the rights of its future clients.[9]

The prudential principle of third-party standing is "not constitutionally mandated, but rather stem[s] from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into

---

[9] As noted above, the district court found the Bail Fund did not have third-party standing to represent the interests of any of its current clients, a ruling the Bail Fund does not challenge.

controversies where the applicable constitutional questions are ill-defined and speculative." *Craig*, 429 U.S. at 193 (citations omitted); *see also Singleton v. Wulff*, 428 U.S. 106, 112 (1976) (plurality opinion) (explaining that Article III standing and the prudential considerations of third-party standing are "distinct"). The rule which generally prohibits a party from resting its claims on the rights of others "assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citing *Warth*, 422 U.S. at 499-500). Also, the absent third parties may "not wish to assert" those rights (or may "be able to enjoy [those rights] regardless" of the outcome of the litigation); they may also be the "best proponents of their own rights." *Singleton*, 428 U.S. at 113-14. Thus, "[f]ederal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation." *Id.* at 113; *see also Kowalski*, 543 U.S. at 130 (explaining that outside of certain limited circumstances, the Supreme Court has "not looked favorably upon third-party standing"); *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1041 (11th Cir. 2008) ("In an ordinary case, a plaintiff is denied standing to assert the rights of third parties.") (citing *Warth*, 422 U.S. at 499).[10]

---

[10] The Supreme Court has more recently questioned whether prudential considerations such as third-party standing are more properly considered as aspects of Article III standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.* 572 U.S. 118, 127 n.3 (2014) (questioning vitality of "prudential standing"

24-10827 & 24-10992    Opinion of the Court                    19

So, in addition to demonstrating Article III standing, a litigant seeking to assert the rights of a third party must satisfy two further inquiries:    First, does "the party asserting the right ha[ve] a 'close' relationship with the person who possesses the right"? *Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).    And second, is there a "'hindrance' to the possessor's ability to protect his own interests"?    *Id.* (quoting *Powers*, 499 U.S.

---

doctrines, including third-party standing, but determining they were issues to be left for another day).    In *June Medical Services L.L.C. v. Russo*, 591 U.S. 299 (2020), a plurality of four justices found Louisiana waived a third-party standing argument by not raising it below; Chief Justice Roberts' concurring opinion agreed as to that point; one dissenting opinion was critical of the third-party standing doctrine as a whole; and another thought its tenets had been misapplied in the case.    591 U.S. at 316-20 (plurality opinion), 354 n.4 (Roberts, C.J., concurring), 359-71 (Thomas, J., dissenting), 400-09 (Alito, J., dissenting).    For now, the doctrine remains.    *See, e.g., Trump v. CASA*, 606 U.S. 831, 866-67 (2025) (Alito, J., concurring) (noting that although the Supreme Court "has not pinned down the precise circumstances in which third-party standing is permissible[,]". . . "[a]t a minimum," a party must show "Article III standing for itself" and demonstrate "it has standing to raise the rights of others" by meeting *Kowalski*'s two prong test of a "close relationship" and "hindrance") (quoting *Kowalski*, 543 U.S. at 129-30) (alterations omitted).

20                    Opinion of the Court                    24-10827

at 411).[11]    *See also Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (reiterating two-part test from *Kowalski*).[12]

We choose to pretermit any discussion of the "close relationship" requirement and proceed straight to the "hindrance" inquiry, finding it dispositive.

---

[11] *Kowalski* also explained that the two-part test had been applied under a more "forgiving" standard in certain circumstances, such as "when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights. 543 U.S. at 130 (emphasis omitted) (quoting *Warth*, 422 U.S. at 510). The Bail Fund argues this exception fits and the district court agreed. However, even assuming § 903.286 is "enforced" against the Bail Fund, doing so does not "result" in the violation of its clients' rights, even indirectly. We think this case is therefore distinguishable from *Craig v. Boren*, 429 U.S. 190 (1976), and *Carey v. Population Services, International*, 431 U.S. 678 (1977), relied on by Judge Jordan in his thoughtful dissent. In those cases, enforcement of a state statute against the litigants (a vendor prohibited from selling beer to 18-20 year old males in *Craig*, and a distributor prohibited from selling non-prescription contraceptives by mail or to minors in *Carey*) "resulted" in a violation of the third-parties' rights (the equal protection rights of 18-20 year old males to buy beer, and the due process privacy rights of individuals to access contraceptives, respectively). *Craig*, 429 U.S. at 195-204; *Carey*, 431 U.S. at 683-99. Here, by contrast, to the extent the rights of pretrial detainees are violated, it's because the statute directly imposes an unconstitutional bail condition on the detainee, not because the Bail Fund lacks the money to bail them out.

[12] Some cases reference a three-part test, with injury-in-fact being the first (followed by close relationship and hindrance). *See, e.g., Powers*, 499 U.S. at 410-11; *Young Apartments*, 529 F.3d at 1042. We have already determined the Bail Fund demonstrates an injury-in-fact as part of the Article III standing analysis and re-adopt it here to the extent necessary.

The law of third-party standing recognizes that if they can do so, parties should assert their own rights rather than relying on someone else to bring claims on their behalf.   *Kowalski,* 543 U.S. at 129; *Warth*, 422 U.S. at 499.   Thus, the Bail Fund has to show there is a hindrance to the detainees' ability to protect their own interests, a "genuine obstacle."   *Singleton*, 428 U.S. at 116.   In undertaking this analysis, the Court looks to whether there are "open avenues" for the absent third parties to seek relief in terms of an available legal forum or process.   *Kowalski*, 543 U.S. at 131-32. We consider both the interest (or lack thereof) the third parties have in pursuing their rights, *Harris v. Evans*, 20 F.3d 1118, 1124 (11th Cir. 1994) (*en banc*), as well as the barriers they may face, such as difficulty following court procedures and advancing the substance of their constitutional claims, *Kowalski*, 543 U.S. at 132, "the economic burdens of litigation," *Powers*, 499 U.S. at 415, fear of further legal consequences, *Young Apartments*, 529 F.3d at 1044, fear of publicly exposing private decisions, *Singleton*, 428 U.S. at 117, and "imminent mootness," *id*.   The Bail Fund contends that several of these hindrances are present here.

In Florida, a defendant can raise an excessive bail claim in a petition for habeas corpus.[13]   *See, e.g.*, *Sewell v. Blackman*, 301 So. 3d 354, 355-56 (Fla. 2d Dist. Ct. App. 2020) (granting habeas petition challenging bond amount, taking into consideration the

---

[13]   A bond challenge filed directly in a criminal case may be converted to a habeas petition.   *See, e.g.*, *Frederick v. Florida*, 318 So. 3d 651 (Fla. 2d Dist. Ct. App. 2021).

defendant's ability to pay and the resources of family member willing to assist[14]); *Byrd v. Mascara*, 197 So. 3d 1211, 1213 (Fla. 4th Dist. Ct. App. 2016) (granting petition to review bond where, among other factors, the financial resources available to the defendant rendered bond excessive); *Norton-Nugin v. Florida*, 179 So. 3d 557, 559 (Fla. 2d Dist. Ct. App. 2015) (granting habeas petition where bond was excessive, akin to "having no bond at all"); *Williams v. Florida*, 71 So. 3d 232, 234 (Fla. 4th Dist. Ct. App. 2011) (granting habeas petition where bond was excessive); *Rodriguez v. McRay*, 871 So. 2d 1001, 1002-03 (Fla. 3d Dist. Ct. App. 2004) (same).

Florida courts take up related challenges too. *See, e.g.*, *Thourtman v. Junior*, 338 So. 3d 207, 210-13 (Fla. 2022) (addressing indigent defendant's challenge that procedures for accessing pretrial conditions did not comport with Florida Constitution);[15] *Cossio v. Marceno*, 334 So. 3d 696, 698 (Fla. 2d Dist. Ct. App. 2022) (granting habeas petitions where bond's no-contact provision violated defendants' fundamental right of marriage, stating the court must guard against "conditions of release that result in sweeping

---

[14] The financial resources of those willing to assist a defendant is one of the criteria Florida courts are to consider in fashioning an appropriate bond. *See* Fla. Stat. § 903.046(2)(f); Fla. R. Crim. P. 3.131(c)(3); *see also Sylvester v. Florida*, 175 So. 3d 813, 814 (Fla. 5th Dist. Ct. App. 2014) (pointing to source of funding as relevant factor trial court should consider on remand in setting appropriate bond).

[15] The Florida Supreme Court noted that although Thourtman's habeas petition was moot because he had been granted pretrial release, the appellate court accepted jurisdiction because the question raised by his petition was "capable of repetition yet evading review." 338 So. 3d at 209.

24-10827 & 24-10992   Opinion of the Court                    23

restrictions on important constitutional rights"); *Frederick*, 318 So. 3d at 652-53 (addressing motion in criminal case that expense of GPS monitor made bond excessive, converting motion to habeas petition); *Casiano v. Florida*, 241 So. 3d 219, 220 (Fla. 2d Dist. Ct. App. 2018) (holding that Florida Constitution did not permit continued detention of defendant until a later hearing to determine source of bond funds); *Florida v. Jones*, 180 So. 3d 1085, 1088 (Fla. 4th Dist. Ct. App. 2015) (considering whether fine was excessive under Eighth Amendment, stating that "when the legislature oversteps its authority, the constitution requires judicial engagement, not judicial abdication") (citation and quotation omitted); *Greenwood v. Florida*, 51 So. 3d 1278, 1279-81 (Fla. 2d Dist. Ct. App. 2011) (granting habeas petition challenging court procedures in determining pretrial release); *Akridge v. Crow*, 903 So. 2d 346, 347-52 (Fla. 2d Dist. Ct. App. 2005) (granting habeas petition by nine indigent petitioners challenging their confinement for inability to pay fines on grounds of equal protection and due process).

Indeed, a Florida district court of appeals has previously considered an Eighth Amendment challenge to § 903.286 on a motion filed by a surety seeking to recover the bond posted for his son-in-law who had previous unpaid fines.   *Ellis v. Hunter*, 3 So. 3d 373 (Fla. 5th Dist. Ct. App. 2009).   While not taking a position on that outcome, this case and those cited above illustrate that the Florida state courts are "open avenues" to address challenges to the

conditions of bail and the constitutionality of § 903.286 in a defendant's criminal case or on a habeas petition.[16]

And, belying the Bail Fund's argument that the public defenders who represent indigent defendants are too busy to take up bail challenges, many of the petitions in the cases noted above were filed by public defenders. *See, e.g.*, *Thourtman*, 338 So. 3d 207; *Frederick*, 318 So. 3d 651; *Casiano*, 241 So. 3d 219; *Norton-Nugin*, 179 So. 3d 557; *Williams*, 71 So. 3d 232; *Greenwood*, 51 So. 3d 1278; *Akridge*, 903 So. 2d 346 (bringing habeas petition on behalf of nine named petitioners and 625 unnamed petitioners); *Rodriguez*, 871 So. 2d 1001. And because counsel were court-appointed, those defendants did not face the economic barriers that can make litigation too costly.

The doors to the Florida state courts are open and accessible to the indigent defendants the Bail Fund seeks to represent and to the constitutional challenges they may wish to make. Mootness, ripeness, and fear of prosecutorial retaliation are not apparent barriers in Florida's state courts.

Alternatively, one or more indigent defendants could bring a challenge to § 903.286 in a § 1983 claim in federal court (such as the

---

[16] Notably, like the surety in *Ellis*, the Bail Fund has filed at least one motion directly in a defendant's criminal case to recover its bond money (there, on grounds that the defendant was subsequently detained on other charges). The county court judge found the Bail Fund had standing to do so and ordered the Clerk to return the funds. *See Florida v. Cooper*, No 2022 MM 1070, Filing # 160901796 (Fla. Leon Cnty. Ct. Nov. 8, 2022).

24-10827 & 24-10992   Opinion of the Court                    25

Bail Fund has done here).    *See, e.g.*, *Schultz v. Alabama*, 42 F.4th 1298, 1312-13 (11th Cir. 2022) (holding *Younger*[17] abstention did not bar consideration of indigent defendant's putative class action challenging county bail system on equal protection and due process grounds); *Walker*, 901 F.3d at 1260-61 (holding *Younger* abstention did not bar consideration of indigent defendants' putative class action challenging bail schedule where challenge was to process, not to the prosecution of any particular case).    At oral argument, the attorney for the Bail Fund said it might be difficult for an indigent client to hire a lawyer to bring a § 1983 claim.    But, of course, nothing prevents the Bail Fund (which has counsel in this case) from employing a lawyer to directly represent an indigent defendant.    *See Kowalski*, 543 U.S. at 132 (questioning why the litigant lawyers elected to file their own suit instead of directly assisting the indigent criminal defendants whose rights they sought to represent).    And, if successful, the lawyer would be entitled to fees under 42 U.S.C. § 1988.

We of course take no position on which course is most likely to yield success or whether any ultimately would.    Rather, the point is that indigent pretrial detainees who believe the Clerk is violating their Eighth Amendment rights to be free from excessive

---

[17] *Younger v. Harris*, 401 U.S. 37, 45 (1971) (restraining federal courts from enjoining state criminal prosecutions).    *See also Walker v. City of Calhoun*, 901 F.3d 1245, 1254 (11th Cir. 2018) (noting more recent disfavor of abstention doctrines).

bail can bring claims in their own names.    There is no hindrance to their doing so within the meaning of *Kowalski*.

★ ★ ★

We do not doubt the Tallahassee Bail Fund's sincerity in trying to assist indigent defendants who cannot afford bail.     And, Florida's current statutory scheme means the Bail Fund helps fewer of these defendants than it (or they) would like.    But the Bail Fund's potential future clients have "open avenues"[18] to protect their right against excessive bail.    The district court properly held the Bail Fund lacks third-party standing to assert this challenge as to its current clients.    For the reasons we have explained, it also lacks third-party standing to raise an excessive bail claim on behalf of its future clients.

## IV

This case also includes a cross-appeal.    The Bail Fund claims the district court erred in dismissing its excessive fines claim against the Clerk in her official capacity for failure to state a claim under Rule 12(b)(6).[19]    That claim is premised on the theory that by using the Bail Fund's bond money to pay a defendant's fines, the Clerk fines the Bail Fund itself in violation of the Eighth Amendment.    To state an Eighth Amendment excessive fines claim, a party must demonstrate (1) that a defendant's withholding of its

---

[18] *Id*. at 131.

[19] For the same reasons stated above in Part III.A., we find the Bail Fund has Article III standing to raise this claim.

funds is a "fine;" and (2) that the fine is excessive.    *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1306 (11th Cir. 2021). And to show that a withholding of funds is a "fine," a party must show that "it can only be explained as serving in part to punish." *Id.* at 1308 (quoting *Austin v. United States*, 509 U.S. 602, 610 (1993)). Money extracted by the government has "punishment" as a purpose if it acts as retribution or deterrence.    *Austin*, 509 U.S. at 610.

As the district court stated, the Bail Fund "voluntarily inject[s] funds into a criminal proceeding on a defendant's behalf—with notice that the funds may be seized."    Dkt. No. 100 at 45. No one requires the Bail Fund to post the bonds or take on any risk. "The Excessive Fines Clause limits the government's power to *extract* payments . . . as *punishment* for some offense."    *Austin*, 509 U.S. at 609-10 (first emphasis supplied, second in original).    That is not what is happening here.[20]

## V

We affirm the district court's dismissal of the Tallahassee Bail Fund's excessive fines claim.    But because the Tallahassee Bail Fund lacks third-party standing to bring its excessive bail claim as to future clients, we reverse the district court's judgment in its

---

[20] The Bail Fund's invocation of the unconstitutional conditions doctrine is to no avail.    The statute, as applied to the Bail Fund, does not condition the Bail Fund's ability to post bail on its accession to excessive fines, because the Bail Fund isn't being fined at all.

28                    Opinion of the Court                    24-10827

favor as to that claim, and remand for proceedings consistent with this opinion.[21]

**MAIN APPEAL REVERSED AND REMANDED; CROSS-APPEAL AFFIRMED.**

---

[21] Because the Bail Fund may have posted bonds in good faith reliance on the district court's injunction, the district court should determine whether the injunction should be vacated prospectively, such that it only applies to new bond deposits by the Bail Fund.

24-10827       JORDAN, J., Concurring and Dissenting              1

JORDAN, Circuit Judge, concurring in part and dissenting in part:

In *United States v. Rose*, 791 F.2d 1477, 1480 (11th Cir. 1986), we held that "the addition of any condition to an appearance bond to the effect that it shall be retained by the clerk to pay any fine that may subsequently be levied against the defendant after the criminal trial is over is for a purpose other than that for which bail is required to be given under the Eighth Amendment. Such provision is therefore 'excessive' and is in violation of the Constitution." The district court, relying on *Rose*, held that Fla. Stat. § 903.286(1) ("the clerk of court shall withhold from the return of a cash bond posted on behalf of a criminal defendant by a person other than a bail bond agent . . . sufficient funds to pay any unpaid costs of prosecution, costs of representation, . . . court fees, court costs, and criminal penalties") was unconstitutional as applied to the Tallahassee Bail Fund.   *See Tallahassee Bail Fund v. Marshall*, 717 F. Supp. 3d 1201, 1216–17 (N.D. Fla. 2024).

The district court's merits ruling is, in my view, undoubtedly correct under *Rose*.   And I agree with the majority that the Bail Fund has Article III standing to challenge § 903.286(1).   The only difficult question is whether the Bail Fund has third-party standing to assert the Eighth Amendment rights of the clients for whom it posts bond.   Unlike my colleagues in the majority, I think the answer to that question is yes.

★ ★ ★ ★ ★

The "circuit courts are bound to adhere to the controlling decisions of the Supreme Court."   *Motorcity, Ltd. by & Through*

*Motorcity, Inc. v. Se. Bank N.A.*, 120 F.3d 1140, 1143 (11th Cir. 1997) (quoting *Jaffree v. Wallace*, 705 F.2d 1526, 1532 (11th Cir. 1983)). This means we "must follow Supreme Court precedent that has 'direct application' in a case, even if it appears that the reasoning of the Supreme Court precedent has been rejected in other cases." *Id.* (quoting *Rodriguez De Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). Importantly, the Supreme Court "does not normally overturn, or [ ] dramatically limit, earlier authority *sub silentio.*" *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 18 (2000).

As I see things, the Bail Fund can assert the rights of its future clients under *Craig v. Boren*, 429 U.S. 190 (1976), and similar cases. "Only the Supreme Court has the prerogative of overruling its own decisions," *Motorcity, Ltd.*, 120 F.3d at 1143 (internal quotation marks and citation omitted), and the Court has not overruled *Craig* and cases like it. *See generally* Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.9.3 (3d ed. 2008 & Sept. 2025 update). To the contrary, both the Supreme Court and this circuit have continued to cite to and apply *Craig*. *See, e.g., Thole v. U.S. Bank*, 590 U.S. 538, 543 (2020) (citing *Craig* with approval); *June Medical Services, LLC v. Russo*, 591 U.S. 299, 319 (2020) (plurality opinion) (same), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 591 U.S. 299, 319 (2022); *Sprint Communs. Co., L.P. v. APCC Servs.*, 554 U.S. 269, 290 (2008) (citing *Craig* without indicating that it has been undermined, abrogated, or overturned); *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1265–67 (11th Cir. 2023)

24-10827        JORDAN, J., Concurring and Dissenting        3

(applying *Craig* without suggesting that it has been undermined, abrogated, or overturned).    For me, *Craig* decides this case.

Generally, "a litigant must assert his own legal rights and interests and may not ordinarily rely on the rights and interests of third parties."    *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994). But the Supreme Court has recognized "three important criteria" that allow a litigant to assert a third party's rights: (1) "a 'sufficiently concrete interest' in the outcome of the issue in dispute," (2) "a close relation to the third party," and (3) the existence of "some hindrance to the third party's ability to protect his or her own interests."    *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (quoting *Singleton v. Wulff*, 428 U.S. 106, 112–16 (1976) (plurality opinion)). "These prudential principles 'are not constitutionally mandated, but rather stem from a salutary "rule of self-restraint" designed to minimize unwarranted intervention into controversies where the applicable questions are ill defined and speculative.'"    *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1041 (11th Cir. 2008) (quoting *Craig*, 429 U.S. at 193).    The majority's opinion focuses on the latter two requirements, so I do as well (though the first requirement is met as well given the Bail Fund's Article III standing).

Some history concerning these *jus tertii* requirements is helpful.    In July of 1976, the Supreme Court addressed in *Singleton* "whether, as a prudential matter, the plaintiff-respondents [were] proper proponents of the particular legal rights on which they base their suit."    428 U.S. at 112.    A plurality of the Court stated that

4              JORDAN, J., Concurring and Dissenting        24-10827

there are "two factual elements" to determine whether the pruden-
tial third-party standing rule should apply in a given case.    *See id.*
at 114 (plurality opinion).    "The first is the relationship of the liti-
gant to the person whose right he seeks to assert."    *Id.* (plurality
opinion).    The second "is the ability of the third party to assert his
own right."    *Id.* at 115–16 (plurality opinion).

Five months later, in December of 1976, the Supreme Court
decided *Craig.*    As relevant here, *Craig* held that a beer vendor had
third-party standing to assert a gender-based equal protection claim
on behalf of third parties—males between 18 and 21 years old who
were unable to buy 3.2% beer under an Oklahoma statute.    *See*
429 U.S. at 191–97.    Critically, this holding commanded a major-
ity of the Court with no mention of those males' ability (or inabil-
ity) to assert their own rights.    *See id.*    *Accord Thole*, 590 U.S. at
543 (describing *Craig* as holding that "vendor who 'independently'
suffered an Article III injury in fact could then assert the rights of
her customers"); *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (cate-
gorizing *Craig* as a case where "enforcement of the challenged re-
striction *against the litigant* would result indirectly in the violation
of third parties' rights") (emphasis in original).    And there was no
indication that males aged 18, 19, or 20 could not have mounted
the same equal protection claim as the beer vendor. Indeed, in the
*Craig* district court proceeding, two such males had been plaintiffs,
*see Walker v. Hall*, 399 F. Supp. 1304, 1306 (W.D. Okla. 1975) (three-
judge court), and any concerns about mootness due to those plain-
tiffs aging out could have been remedied through a class action.

24-10827       JORDAN, J., Concurring and Dissenting             5

*Craig*, by the way, is not the only case in which the Supreme Court has allowed a litigant to assert the rights of third parties without a showing that there was some hindrance to those parties asserting their own rights.   In *Carey v. Population Services International*, 431 U.S. 678 (1977), a vendor of contraceptives challenged a New York law which prohibited the sale of contraceptives to minors under the age of 16.   The Court allowed the vendor to assert the constitutional rights of "potential clients" below the age of 16 without discussing any hindrance to such minors vindicating their own rights:

> That PPA [the vendor] has standing to challenge [N.Y. Ed. L. § 6811(8)] not only in its own right but also on behalf of its potential customers, is settled by *Craig*, . . . [which] held that a vendor of 3.2% beer had standing to challenge in its own right and as advocate for the rights of third persons, the gender-based discrimination in a state statute that prohibited sale of the beer to men, but not to women, between the ages of 18 and 21. In this case, as did the statute in *Craig*, § 6811(8) inflicts on the vendor PPA "injury in fact" that satisfies Art. III's case-or-controversy requirement, since "(t)he legal duties created by the statutory sections under challenge are addressed directly to vendors such as [PPA. It] is obliged either to heed the statutory [prohibition], thereby incurring a direct economic injury through the constriction of [its] market, or to disobey the statutory command and suffer" legal sanctions. Therefore, PPA is among the "vendors and those in like positions [who] have been uniformly

6            JORDAN, J., Concurring and Dissenting        24-10827

permitted to resist efforts at restricting their opera-
tions by acting as advocates for the rights of third par-
ties who seek access to their market or function." As
such, PPA "is entitled to assert those concomitant
rights of third parties that would be 'diluted or ad-
versely affected' should [its] constitutional challenge
fail."

*Id.* at 683–84 (citations and footnote omitted).[1]

The majority here says that a more stringent standard ap-
plies when the challenged statute's enforcement against the litigant
does not result in the violation of the third parties' rights, and a
"quite forgiving" standard governs when the challenged restriction
is enforced against the litigant.    *See* Maj. Op. at 18 n.11; *Kowalski*,
543 U.S. at 130.    Even accepting this dichotomy as correct,
§ 903.286(1) is directly enforced against the Bail Fund, resulting in
an indirect violation of rights in the same way as in *Craig* and *Carey*.

The statute provides that "the clerk of the court shall with-
hold from the return of a cash bond posted on behalf of a criminal
defendant *by a person other than a bail bond agent* . . . sufficient funds
to pay any unpaid costs of prosecution, costs of representa-
tion[,] . . . court fees, court costs, and criminal penalties."
§ 903.286(1) (emphasis added).    The enforcement of the statute

---

[1] In the First Amendment context, the Supreme Court also permits third-
party standing without a showing of hindrance.    *See, e.g., Virginia v. Am.
Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) (allowing booksellers to assert the
First Amendment rights of adults in challenge to state statute prohibiting the
commercial display or sale of certain sexually-related material).

24-10827        Jordan, J., Concurring and Dissenting        7

necessarily contemplates action (the retention of money) by the clerk against a person or entity other than the criminal defendant for whom bond was posted.    *Compare Dep't of Lab. v. Triplett,* 494 U.S. 715, 720–21 (1990) (holding that an attorney could challenge a fee restriction by asserting the rights of his or her clients), *with Kowalski,* 543 U.S. at 130 (holding that an attorney could not challenge a state statute restricting appointment of appellate counsel).[2]

Simply stated, the clerk withholds funds belonging to the Bail Fund, a non-profit organization which "relies on a revolving fund model to carry out its mission."    *Tallahassee Bail Fund*, 717 F. Supp. 3d at 1209–10.    Because the money retained by the clerk belongs to the Bail Fund, the statute is necessarily enforced against the Fund, and affects it in a very direct and pecuniary way.    The situation here therefore fits neatly into the *Craig* group of litigants who are "uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access" to their market, function, or services.    *See Craig*, 429 U.S. at 195 (citing *Eisenstadt v. Baird*, 405 U.S. 438, 445–46 (1972), *Sullivan v. Little Hunting Park*, 396 U.S. 229, 237 (1969), and *Barrows v. Jackson*, 346 U.S. 249, 257 (1953)).    As the Supreme Court has

---

[2] This also distinguishes § 903.286(1) from the statutes challenged in *Holland v. Rosen*, 895 F.3d 272 (3d Cir. 2018), and *Collins v. Daniels*, 916 F.3d 1302 (10th Cir. 2019).    The Third and Tenth Circuits held in those cases that bail bond companies did not have third-party standing to challenge the bail systems in New Jersey and New Mexico, but the statutes in question made no mention of the person, entity, or company posting the bond. *See Holland*, 895 F.3d at 280–83; *Collins*, 916 F.3d at 1308–09.

8                  JORDAN, J., Concurring and Dissenting        24-10827

"explained, 'the obvious claimant' and 'the least awkward challenger' is the party upon whom the challenged statute imposes 'legal duties and disabilities.'"   *June Medical Services, LLC*, 591 U.S. at 319 (plurality opinion) (citing, among other cases, *Craig* and *Carey*). Here that "obvious claimant" is the Bail Fund.

The district court also made factual findings on the connection between the enforcement of the statute against the Bail Fund and the violation of indigent detainees' rights.   *See Tallahassee Bail Fund*, 717 F. Supp. 3d at 1208 ("If Defendant had not withheld these funds from Plaintiff, the organization would have bailed out more people. This fact is established by [the Fund's founder] credible testimony on this point. . . . This fact, combined with the documentary evidence showing the thousands of dollars Defendant has withheld from Plaintiff backs up [the Fund's founder] testimony that Defendant deprived Plaintiff of funds that it otherwise would have used to bail out indigent pretrial detainees, as it did with the limited funds that were available."import).   These findings were not clearly erroneous.   In *Craig*, the future clients could not access beer; in *Carey*, the future clients could not access contraceptives; in this case, the future clients cannot access funds that would otherwise be available to them but for the enforcement of the statute. *See Craig*, 429 U.S. at 194–96; *Carey*, 431 U.S. at 683–84.

★ ★ ★ ★ ★

Even if we consider the hindrance requirement despite cases like *Craig* and *Carey*, I think the majority has transformed it into an almost absolute prohibition on *jus tertii* standing if the third party

24-10827        JORDAN, J., Concurring and Dissenting        9

has any "open avenues" to assert its rights.    *See* Maj. Op. at 19. This approach seems to me inconsistent with *Singleton* and its progeny, which explain that the inquiry is rooted in the courts' "prefer[ence] to construe legal rights only when the most effective advocates of those rights are before them."    *Singleton*, 428 U.S. at 114.

For example, in *Powers*, 499 U.S. at 410–15, a criminal defendant was permitted third-party standing to assert the equal protection rights of jurors who had been excluded from service on the basis of race.    The Supreme Court concluded that the hindrance requirement was satisfied, even though such jurors could file their own lawsuits, because those actions were "rare," and the barriers (procedural and otherwise) to such actions were "daunting."    *See id.* at 414–15.    The same is true here.

Criminal defendants in Florida who have their bonds posted by others may theoretically be able to challenge § 903.286(1) in their own cases, but they face significant procedural and practical obstacles to doing so.    I list some of them below.

First, a defendant whose bond has been put up by another—the person or entity whose money is retained by the clerk—faces formidable standing issues under Florida law in challenging the statute for the benefit of the one who posted bond.    Because the money that can be retained by the clerk belongs to the person or entity posting the bond, a defendant will have difficulty showing how the statute causes him any harm.    *See, e.g., State v. Wellman*, 726 So. 2d 380, 382 (Fla. 2d DCA 1999) (holding that a defendant

convicted of driving under the influence could not challenge, in his own criminal case, a statute requiring the temporary impoundment of the vehicle he was driving, which was owned by his employer: "Since appellee was not the owner of the impounded vehicle, he could not challenge its impoundment.").

Second, § 903.286(1) operates to retain bond money put up by another only upon the defendant's conviction. As a result, a defendant who mounts a pretrial challenge to the statute on Eighth Amendment grounds faces significant ripeness issues. *See, e.g., Green v. State*, 975 So. 2d 1090, 1115 (Fla. 2008) (capital defendant's claim that he might be incompetent at the time of his execution was not ripe because a death warrant had not yet been signed); *State v. Oakley*, 515 So. 3d 1012, 1013 (Fla. 4th DCA 1987) (defendant's claim, in a drunk driving case, that blood test law unconstitutionally shifted the burden of proof—by creating a mandatory rebuttable presumption of impairment from blood alcohol level of 0.10 or more—was not ripe when raised in pretrial motion, as the alleged shifting of the burden of proof would not occur until trial).

Third, as the district court explained, *Bostick v. United States*, 400 F.2d 449, 451 (5th Cir. 1968), holds that an excessive bail claim becomes moot after the trial court enters a judgment of conviction. This precedential decision would presumably present an insurmountable obstacle in a post-conviction action under 42 U.S.C. § 1983—even if the future indigent clients asked their public defenders or court-appointed counsel to challenge the statute. *See*

*Liner v. Jafco, Inc.*, 375 U.S. 301, 304 (1964) (explaining that "the question of mootness is itself a question of federal law").

Fourth, one Florida appellate court has rejected an Eighth Amendment challenge to § 903.286(1).    *See Ellis v. Hunter*, 3 So. 3d 373, 381–83 (Fla. 5th DCA 2009).    *Ellis* is the only reported Florida case addressing such an attack on the statute, and that challenge was brought by the surety, and not by the defendant.    *See id.* at 377.    So Eighth Amendment attacks by criminal defendants on the statute seem to be non-existent.

In sum, the obstacles facing future indigent clients unable to post bail without the Bail Fund are more than sufficient to satisfy the hindrance requirement (assuming it even applies).    The Bail Fund has third-party standing to assert the Eighth Amendment rights of those clients.    *See Powers*, 499 U.S. at 414–15.

★ ★ ★ ★ ★

While the majority "pretermit[s]" any discussion of the close relationship requirement by deciding that the hindrance prong is not met, *see* Maj. Op. at 18, I'll discuss briefly why the close relationship requirement is satisfied.

It is well-settled that the interests of the litigant and the third parties need only be sufficiently aligned, and not identically or perfectly aligned.    *See Young Apartments*, 529 F.3d at 1042.    The Bail Fund and its future clients have a shared interest in the Fund having adequate funds to bail the future clients out, affording them access to pretrial release.    *See Tallahassee Bail Fund*, 717 F. Supp. 3d at

12          JORDAN, J., Concurring and Dissenting          24-10827

1213.    And less money withheld means the Bail Fund can help more clients.    That is a sufficient alignment of interests.

In addition, there may be future clients who, upon conviction, would be willing to pay their own fines and costs as a way of demonstrating responsibility for their actions.    Not all indigent defendants will be necessarily looking for a free ride.

Finally, the defendants' contention that the Fund has no relationship with future clients yet lacks merit.    "[N]either the Supreme Court nor the Eleventh Circuit has held that a litigant attempting to assert the rights of third parties must name with certainty potential clients."    *Tallahassee Bail Fund*, 717 F. Supp. 3d at 1213.    *See also Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 334 n.10 (5th Cir. 1981) (stating that "adjudication of the constitutional claims of *potential* patients is sufficiently necessary to allow *jus tertii* standing") (emphasis added and citation omitted).

★ ★ ★ ★ ★

I would affirm the district court's decision in its entirety, and respectfully dissent from the majority's holding that the Fund lacks third-party standing.